# EXHIBIT 1

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

STATE OF SOUTH CAROLINA

COUNTY OF LEXINGTON

Town of Lexington,
                              Plaintiff,

        vs.

3M Company, Inc.; Daikin America, Inc.; Du
Pont de Nemours, Inc.; E.I. DuPont de Nemours,
Inc.; EIDP, Inc. f/k/a E.I. du Pont de Nemours
and Company; Corteva, Inc.; The Chemours
Company; The Chemours Company FC, LLC;
Ascend Performance Materials, Inc.; Ascend
Performance Materials Operations, LLC;
Burlington Industries, Inc.; Cintas Corporation
No. 2 d/b/a Cintas Cleanroom Corporation;
CompX, LLC; CompX Security Products, Inc.;
CPJ Technologies, Inc.; Jain-Chem, Ltd.;
Ulterion International, LLC; Ulterion
International Exports II, Inc.; Masha, LLC;
DayStrong Rubber Products, LLC; Elevate
Textiles, Inc. f/k/a Safety Components
International, Inc. f/k/a International Textile
Group, Inc.; FUJIFILM Holdings America
Corporation; FUJIFILM Manufacturing U.S.A.,
Inc.; Milliken & Company; QualaWash
Holdings, LLC; Roll Technology Corporation
f/k/a Carolina Plating Company; Safety
Components Fabric Technologies, Inc.; Shaw
Industries Group, Inc.; Solvay Specialty
Polymers USA, LLC; Saint-Gobain Abrasives,
Inc.; T & S Brass and Bronze Works, Inc.; Teijin
Carbon America, Inc.; Unichem Specialty
Chemicals, LLC.; and Unifirst Corporation,

                              Defendants.

IN THE COURT OF COMMON PLEAS
ELEVENTH JUDICIAL CIRCUIT

C/A No.: 2025-CP-32-00177

**SUMMONS**
**As to Amended Complaint**

(Jury Trial Demanded)

**TO:     THE DEFENDANTS ABOVE NAMED:**

        YOU ARE HEREBY SUMMONED AND REQUIRED to answer the Amended

Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your

Answer thereto on the subscriber at the address listed below, within thirty (30) days after the

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

service hereof, exclusive of the day of such service; and if you fail to answer the Amended

Complaint within the time aforesaid, judgment by default will be rendered against you for the relief

demanded in the Amended Complaint.  Any answer that you serve the parties to this action must

be filed with the Clerk of this Court within a reasonable period of time after service.

*s/Amy L.B. Hill*

Amy L.B. Hill, SC Bar No.: 68541
William C. Lewis, SC Bar No.: 101287
Richardson Thomas, LLC
1513 Hampton Street
Columbia, South Carolina 29201
T: 803-281-8150
F: 803-632-8263
amy@richardsonthomas.com
will@richardsonthomas.com

and

Lee T. Patterson
*(pro hac vice admission pending)*
Ethan R. Wright
*(pro hac vice admission pending)*
Carmen V. Paige
*(pro hac vice admission pending)*
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
T: 205-278-7057
F: 205-278-7001
lpatterson@friedman-lawyers.com
ewright@friedman-lawyers.com
cpaige@friedman-lawyers.com

***Attorneys for Plaintiff***

January 14, 2025

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

STATE OF SOUTH CAROLINA

COUNTY OF LEXINGTON

Town of Lexington,

                            Plaintiff,

            vs.

3M Company, Inc.; Daikin America, Inc.; Du Pont de Nemours, Inc.; E.I. DuPont de Nemours, Inc.; EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company; Corteva, Inc.; The Chemours Company; The Chemours Company FC, LLC; Ascend Performance Materials, Inc.; Ascend Performance Materials Operations, LLC; Burlington Industries, Inc.;   Cintas Corporation No. 2 d/b/a Cintas Cleanroom Corporation; CompX, LLC; CompX Security Products, Inc.; CPJ Technologies, Inc.; Jain-Chem, Ltd.; Ulterion International, LLC; Ulterion International Exports II, Inc.; Masha, LLC; DayStrong Rubber Products, LLC; Elevate Textiles, Inc. f/k/a Safety Components International, Inc. f/k/a International Textile Group, Inc.; FUJIFILM Holdings America Corporation;    FUJIFILM    Manufacturing U.S.A.,   Inc.;   Milliken   &   Company; QualaWash Holdings, LLC; Roll Technology Corporation f/k/a Carolina Plating Company; Safety Components Fabric Technologies, Inc.; Shaw Industries Group, Inc.; Solvay Specialty Polymers USA, LLC; Saint-Gobain Abrasives, Inc.; T & S Brass and Bronze Works, Inc.; Teijin   Carbon   America,   Inc.;   Unichem Specialty   Chemicals,   LLC.;   and   Unifirst Corporation,

                            Defendants.

IN THE COURT OF COMMON PLEAS
ELEVENTH JUDICIAL CIRCUIT

C/A No.: 2025-CP-32-00177

**AMENDED COMPLAINT**

(Jury Trial Demanded)

        Plaintiff Town of Lexington ("Lexington"), by and through the undersigned counsel, brings

this action against the following defendants: 3M Company, Inc.; Daikin America, Inc.; DuPont de

Nemours, Inc.; E.I. DuPont de Nemours, Inc.; EIDP, Inc. f/k/a E.I. du Pont de Nemours and

Company; Corteva, Inc.; The Chemours Company; The Chemours Company FC, LLC; Ascend

1

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320017

Performance Materials, Inc.; Ascend Performance Materials Operations, LLC; Burlington Industries, Inc.; Cintas Corporation No. 2 d/b/a Cintas Cleanroom Corporation; CompX, LLC; CompX Security Products, Inc.; CPJ Technologies, Inc.; Jain-Chem, Ltd.; Ulterion International, LLC; Ulterion International Exports II, Inc.; Masha, LLC; DayStrong Rubber Products, LLC; Elevate Textiles, Inc., f/k/a Safety Components International, Inc. f/k/a International Textile Group, Inc.; FUJIFILM Holdings America Corporation; FUJIFILM Manufacturing U.S.A., Inc.; Milliken & Company; QualaWash Holdings, LLC; Roll Technology Corporation f/k/a Carolina Plating Company; Safety Components Fabric Technologies, Inc.; Shaw Industries Group, Inc.; Solvay Specialty Polymers USA, LLC; Saint-Gobain Abrasives, Inc.; T & S Brass and Bronze Works, Inc.; Teijin Carbon America, Inc.; Unichem Specialty Chemicals, LLC; and Unifirst Corporation (collectively "Defendants").

Lexington seeks damages related to the release of chemicals that have invaded, contaminated and trespassed into Lexington's drinking water supply and wastewater, and have caused and will cause Lexington to incur extensive additional capital and operating expenses to remove such chemicals from its drinking water and wastewater effluent. Lexington sets forth in detail the parties, facts, legal claims, and damages with particularity, as follows:

## **BACKGROUND**

1.     Many of South Carolina's textile manufacturers have used a family of chemicals, referred to as "PFAS"[1] or "forever chemicals," to impart stain resistant and non-stick properties to

---

[1] Unless otherwise delineated, the term "PFAS" or "PFAS Chemicals" in this Complaint refers to any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to), collectively, related chemicals that degrade to PFAS/PFOA/PFOS, and any precursors to PFAS/PFOA/PFOS, including, but not limited to, PFOA, PFOS, Gen-X, HFPO-DA, NEtFOSAA, NMeFOSAA, PFBS, PFDA, PFDoA, PFHpA, PFHxS, PFNA, PFTrDA, PFTA, PFUnA, 11Cl0PF3OUdS, 9Cl-PF3ONS, ADONA, PFPeS, PFHpS, 4:2 FTS (1H, 1H, 2H, 2H,-

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

textiles. PFAS is also commonly used in metal finishing, paper finishing, plastics coating, and aerospace industries, among others, for the ability to repel water, dirt, and oil, among other things.

2.     Lexington currently receives its drinking water by and through a drinking water treatment facility operated by the City of West Columbia pursuant to the Water Sale and Purchase agreement Between the City of West Columbia, South Carolina and Town of Lexington, South Carolina dated April 2, 2007, including the First Amendment dated April 8, 2009 (collectively "the Agreement").

3.     Lexington relies on the water from Lake Murray, a Saluda River impoundment, as its primary source of drinking water. Lake Murray contains PFAS in concentrations in excess of what the Environmental Protection Agency ("EPA") now considers safe.  Lexington relies on the water from Lake Murray to provide up to 7.92 million gallons of drinking water per day to approximately 11,000 customers, current and future under the current West Columbia expansion project.

4.     PFAS do not break down in the environment and are known to be bio-persistent, bio-accumulative, and toxic. PFAS are an endocrine disruptor which can cause an array of adverse health effects, including various cancer and birth defects, among other things.

5.     Defendants, at all times relevant to this Complaint, have manufactured, sold, used and/or caused the unauthorized discharge of PFAS into Lake Murray, from which Lexington currently sources its drinking water.

6.     PFAS are self-propelled and highly mobile once released into the environment.

---

perfluorohexane sulfonic acid), 6:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 8:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), PFBA, PFPeA, PFMBA, PFMPA, PFEESA, and NFDHA. It is Lexington's intention that this definition is as broad, expansive, and inclusive as possible.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

7.     Defendants' PFAS enters the environment via several different pathways: direct discharge from an industrial point source; "pass through" contamination from wastewater or leachate containing PFAS introduced into conventional wastewater treatment plants incapable of removing PFAS prior to discharge; contamination from land application of sludge contaminated with PFAS and groundwater contamination from manufacturing facilities.

8.     The unique properties of PFAS make them resistant to conventional water and wastewater treatment.  The Defendants knew or should have known for decades that PFAS resist conventional water and wastewater treatment technologies and that improper instruction with regard to handling PFAS waste would result in widespread PFAS contamination.

9.     PFAS may only be removed from water and wastewater using sophisticated treatment technologies such as reverse osmosis ("RO") or granulated activated carbon ("GAC"). Nonetheless, Defendants continued to manufacture, use, discharge, inadequately warn, and improperly dispose of PFAS either directly or indirectly through conventional wastewater treatment plants upstream of where Lexington sources its drinking water, thus adversely impacting both Lexington's drinking water and wastewater.

10.     Recently, the EPA announced heightened regulations for certain PFAS. The new maximum contaminant level ("MCL") mandates that the two primary types of PFAS, PFOA and PFOS, shall not exceed four parts per trillion ("ppt") in public drinking water. The EPA has also implemented a 10 ppt standard for commonly used "short chain" PFAS compounds: PFHxS, PFNA, and HFPO-DA. Additionally, the MCL contains a "Hazard Index" which regulates other commonly used PFAS chemicals as a group according to combined toxicity.

11.     In addition to the binding MCLs and Hazard Index for these PFAS, the EPA has also established a Maximum Contaminant Level Goal ("MCLG") of 0.0 ppt for PFOS and

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

PFOA—meaning that there is no level of PFOS or PFOA "at which no known or anticipated adverse effects on the health of persons" may occur.

12.      As it stands, Lexington currently purchases water from West Columbia, which utilizes legacy water treatment technology that features a chlorine disinfectant process, which is not capable of removing PFAS from source water. Through no fault of its own, Lexington must fund its pro rata share of plant improvements and operational costs to adequately address Defendants' PFAS.

13.      By agreement, Lexington relies on the City of Cayce for its wastewater treatment. Lexington must fund its share of wastewater expenses as the City of Cayce works to eliminate PFAS from its wastewater effluent and bring its system into compliance with the Antidegradation Rules of the South Carolina Code and Regulations.

14.      Lexington will be forced to incur substantially increased capital and operating expenses related to PFAS removal from drinking water and wastewater.  Lexington seeks compensation from Defendants for these PFAS-related expenses.

## **PARTIES**

I.      **Plaintiff Town of Lexington**

15.      Plaintiff Town of Lexington was established pursuant to South Carolina Statutes as a body politic for the purpose of operating a county-wide water and sewer utility system for the benefit of Lexington County and customers of Lexington.  Initially formed by Lexington County, the City of Cayce, the Town of Swansea and the Town of Pelion, Lexington also currently includes Town of Lexington, the City of West Columbia, the Town of Batesburg-Leesville, the Gilbert Rural Water District, the Town of Springdale, the Town of Gaston and the Town of South Congaree.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

16.     Lexington, among other responsibilities, provides drinking water to its customers.

17.     Through West Columbia, Lexington obtains water primarily from Lake Murray. The present capacity allows for the filtration of up to 27 million gallons per day of raw water with additional capacity moving to 36 million gallons per day of additional capacity via planned expansion, for which Lexington is contractually obligated to pay for treatment costs.

18.     Currently, drinking water is processed by West Columbia's water filtration plant and delivered to customers through Lexington's potable water distribution system.  Lexington is responsible for its pro rata share of treatment costs for the potable water it distributes pursuant to the West Columbia Agreement.

19.     In addition to treating and providing drinking water through its contractual relationship with West Columbia, Lexington is also responsible for increased capital expenses associated with wastewater treatment by and through its agreement with the City of Cayce as more precisely described in the Cayce Agreement.

20.     West Columbia's water treatment plant utilizes conventional treatment technology that is incapable of removing Defendants' PFAS from drinking water, and the City of Cayce utilizes conventional treatment technology that is incapable of removing Defendants' PFAS prior to discharge.  Lexington will incur additional expenses as West Columbia and the City of Cayce are forced to incur expenses to upgrade their treatment technology to remove Defendants PFAS from source water and wastewater effluent.

21.     At all times relevant hereto, Lexington has suffered substantial damage to its property and property interests.

22.     Because PFAS are resistant to conventional treatment technology relied on by West Columbia, Lexington is contractually obligated to pay for these water and wastewater treatment

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320017

facilities to be upgraded in order to remove Defendants' PFAS to levels deemed safe by the Federal Government and upgrade its future water treatment plant to remove Defendants' PFAS, including increased plant costs and operating expenses.

23.     Lexington has been and continues to be damaged due to the negligent, willful, and wanton conduct of the Defendants, as well as the continuous nuisance and trespass caused by Defendants' past and present manufacture, use, purchase, sale, supply, discharge, and release of PFAS into water and wastewater.

24.     As a direct and proximate result of Defendants' conduct, Lexington has suffered, and will continue to suffer, substantial economic and consequential damage, including but not limited to: past and future expenses associated with the testing and monitoring of PFAS contamination levels in Plaintiff's raw water and drinking water; past and future expenses associated with testing, monitoring, and installing temporary emergency filtration and pumping systems; pilot program costs associated with permanent filtration systems capable of removing Defendants' PFAS from Lexington's drinking water; past and future costs associated with the purchase, installation, and operation of permanent filtration systems capable of removing Defendants' PFAS from Lexington's drinking water and wastewater; costs associated with remediating Lexington's existing treatment and pumping facilities; damage to goodwill and reputation; and lost revenue and sales.  In addition, Lexington seeks past, present, and future engineering, operating, and maintenance costs.

25.     Lexington seeks compensatory and punitive damages to the fullest extent allowed by South Carolina law.  This includes but is not limited to compensatory damages to upgrade Lexington's water and wastewater treatment technology to be able to remove all PFAS from drinking water and wastewater, filtration equipment, piping, and other necessary infrastructure.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

Lexington also seeks damages for increased operational expenses associated with the operation of these facilities, such as increased electrical expenses, staffing expenses, and proper disposal of any associated byproducts related to PFAS treatment.

## II.    Defendants

### A.    __PFAS Manufacturers__[2]

26.    **3M Company, Inc. ("3M")** is a foreign corporation organized under the laws of the State of Delaware and is registered to transact business in the State of South Carolina.  3M has operated facilities at multiple locations in South Carolina and currently operates a plant in Greenville, South Carolina.  3M has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products that degrade PFAS into South Carolina.  PFAS manufactured, sold, used, and/or transported by 3M is currently contaminating Lexington's drinking water and wastewater.  As a result, 3M is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

27.    **Daikin America, Inc. ("Daikin")** is a foreign corporation organized under the laws of the State of Delaware, headquartered in Orangeburg, New York, and is conducting business in the State of South Carolina. Upon information and belief, Daikin is a wholly owned subsidiary of Daikin Industries Ltd.  Daikin has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products that degrade PFAS into South Carolina.  PFAS manufactured, sold, used, and/or transported by Daikin is currently contaminating Lexington's drinking water and wastewater.  As a result, Daikin is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

---

[2] The Defendants described in this Section are all collectively referred to as "PFAS Manufacturers."

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

28.     **DuPont de Nemours, Inc.[3] ("DuPont")** is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of South Carolina. DuPont has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products that degrade PFAS into South Carolina. PFAS manufactured, sold, used, and/or transported by DuPont is currently contaminating Lexington's drinking water and wastewater.  As a result, DuPont is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

29.     **E.I. du Pont de Nemours, Inc. ("E.I. du Pont")** is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of South Carolina. E.I. du Pont has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products that degrade PFAS into South Carolina.  PFAS manufactured, sold, used, and/or transported by E.I. du Pont is currently contaminating Lexington's drinking water and wastewater.  As a result, E.I. du Pont is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

30.     **EIDP, Inc. ("EIDP") f/k/a E.I. du Pont de Nemours and Company** is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of South Carolina.  EIDP has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products that degrade PFAS into South Carolina.  PFAS manufactured, sold, used, and/or transported by EIDP is currently contaminating Lexington's drinking water and wastewater.  As a result, EIDP is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

---

[3] DuPont de Nemours, Inc., E.I. du Pont de Nemours, Inc., EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company, and Corteva, Inc. are collectively referred to as "DuPont."

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

31.        **Corteva, Inc. ("Corteva")** was a foreign corporation organized under the laws of the State of Delaware and was previously authorized to transact business in the State of South Carolina.  Corteva has manufactured, sold, used and/or transported PFAS and PFAS-related products or products that degrade PFAS into South Carolina.  PFAS manufactured, sold, used, and/or transported by Corteva is currently contaminating Lexington's drinking water and wastewater.  As a result, Corteva is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

32.        **The Chemours Company ("Chemours")** is a foreign corporation organized under the laws of the State of Delaware and is authorized to transact business in the State of South Carolina.  Chemours has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products that degrade PFAS into South Carolina.  PFAS manufactured, sold, used, and/or transported by Chemours is currently contaminating Lexington's drinking water and wastewater.  As a result, Chemours is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

33.        **The Chemours Company FC, LLC ("Chemours FC")** is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of South Carolina. Chemours FC has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products that degrade PFAS into South Carolina.  PFAS manufactured, sold, used, and/or transported by Chemours FC is currently contaminating Lexington's drinking water and wastewater.  As a result, Chemours FC is causing and contributing to a continuous nuisance, trespass, and injury to Lexington in Lexington County, South Carolina.

**B.**     **PFAS Users**[4]

34.     **Ascend Performance Materials, Inc. ("Ascend")** is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of South Carolina.  Ascend Performance Materials Inc. is the parent company of Ascend Performance Materials Operations, LLC, which owns and operates a manufacturing plant in Greenwood, South Carolina, on the banks of Lake Greenwood.  Ascend Performance Materials, Inc. and Ascend Performance Materials Operations, LLC are collectively referred to as the "Ascend Defendants." Ascend has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Ascend continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

35.     **Ascend Performance Materials Operations, LLC ("Ascend Operations")** is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of South Carolina.  Ascend Operations owns and operates a manufacturing plant located at 1515 Hwy 246 S, Ninety Six, Greenwood, South Carolina, on the banks of Lake Greenwood. Ascend Operations has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Ascend Operations continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

36.     **Burlington Industries, Inc. ("Burlington")** was organized under the laws of the State of Delaware and was previously authorized to do business in the State of South Carolina. Burlington owned and operated textile mills which discharged wastewater containing PFAS

---

[4] The list of defendants in this section are all collectively referred to as "PFAS Users."

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

upstream from where Lexington draws its drinking water.  Upon information and belief, biosolids from these plants and treatment plants which accepted contaminated wastewater from Burlington were also land-applied in areas that resulted in run off into Lake Murray or related tributaries, which further have contributed to the PFAS contamination of Lake Murray upstream from Lexington's raw water intake.  Due to the persistent nature of PFAS, wastewater discharged by Burlington during its operations continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water supply in Lexington County, South Carolina. Burlington is currently in bankruptcy, but attorney Peter McCoy, a Charleston County, South Carolina resident, has been appointed as receiver for Burlington in a matter pending in Lexington County, South Carolina. *See Mimms v. Burlington Indus., Inc. et al.*, C.A. No. 2021-CP-40-05873, Order Appointing Receiver Over Defendant Burlington Industries, Inc. (Richland Cnty. Ct. of Common Pleas May 13, 2022).

37.    **Cintas Corporation No. 2 d/b/a Cintas Cleanroom Corporation ("Cintas")** is a foreign corporation organized under the laws of the State of Nevada and is authorized to do business in the State of South Carolina. Cintas has locations throughout South Carolina.  Cintas has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Cintas continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

38.    **CompX, LLC ("CompX")** is a domestic limited liability company organized under the laws of South Carolina and is authorized to transact business in the State of South Carolina.  CompX has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, CompX continues to invade, trespass,

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

39.     **CompX Security Products, Inc. ("CompX Security")** is an entity organized pursuant to the laws of the State of Delaware and is authorized to transact business in the State of South Carolina. CompX Security has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, CompX Security continues to invade, trespass, injure and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

40.     **CPJ Technologies, Inc., Jain-Chem, Ltd., Ulterion International, LLC, Ulterion International Exports II, Inc., and Masha, LLC (collectively "CPJ")** are all domestic entities organized under the laws of South Carolina and authorized to do business in the State of South Carolina.  The CPJ Defendants all appear to be chemical manufacturers operating from the same location – 200 Tanner Drive Taylors, South Carolina.  CPJ has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, CPJ continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

41.     **DayStrong Rubber Products, LLC ("DayStrong")** is a domestic limited liability company organized under the laws of South Carolina and is authorized to do business in the State of South Carolina.  DayStrong operates a plant or manufacturing location in South Carolina.  DayStrong has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, DayStrong continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

42.     **Elevate Textiles, Inc. ("Elevate")** f/k/a Safety Components International, Inc. f/k/a International Textile Group, Inc. is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of South Carolina.  Elevate is the current owner and operator of Burlington, which has discharged and continues to discharge wastewater containing PFAS upstream from where Lexington draws its drinking water, and as a result, Elevate and its predecessor interests continue to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

43.     **FUJIFILM Holdings America Corporation ("FUJIFILM Americas")** is a foreign corporation organized under the laws of Delaware and is authorized to do business in the State of South Carolina.  Fujifilm Americas is the parent company of Defendant FUJIFILM Manufacturing U.S.A., Inc., ("Fujifilm Manufacturing" and with Fujifilm Americas collectively "Fujifilm Defendants") which owns and operates a manufacturing facility located at 211 Puckett Ferry Rd, Greenwood, SC 29649 on the banks of Lake Greenwood.  FUJIFILM Americas has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, FUJIFILM Americas continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

44.     **FUJIFILM Manufacturing U.S.A., Inc. ("FUJIFILM Manufacturing"** and with Fujifilm Americas collectively "Fujifilm Defendants") is a domestic corporation organized under the laws of the State of South Carolina and is authorized to transact business in the State of South Carolina.  FUJIFILM Manufacturing owns and operates a manufacturing facility located at 211 Puckett Ferry Rd, Greenwood, SC 29649 on the banks of Lake Greenwood.  FUJIFILM

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

Manufacturing has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, FUJIFILM Manufacturing continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

45.    **Milliken & Company ("Milliken")** is a global company incorporated in Delaware but formed in South Carolina with its headquarters and principal place of business located in Spartanburg, South Carolina.  Defendant has been registered to do business in South Carolina since 1949.  Milliken has owned and continues to own and operate many facilities which have discharged PFAS waste upstream of Lexington's drinking water intake.   Milliken operates a plant or manufacturing location in South Carolina.  Milliken has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Milliken continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

46.    **QualaWash Holdings, LLC ("QualaWash")** is a foreign limited liability company organized under the laws of Florida and is authorized to transact business in the State of South Carolina. QualaWash has multiple locations in South Carolina.  QualaWash operates a plant or manufacturing location in South Carolina. QualaWash has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, QualaWash continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

47.    **Roll Technology Corporation f/k/a Carolina Plating Company, Inc. ("Roll Tech")** is a domestic corporation organized under the laws of the State of South Carolina and is authorized to transact business in the State of South Carolina.  Roll Tech operates a plant or

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

manufacturing location in South Carolina. Roll Tech has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Roll Tech continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

48.    **Safety Components Fabric Technologies, Inc. ("Safety Components")** is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of South Carolina. Safety Components operates a manufacturing location in South Carolina. Safety Components has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Safety Components continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

49.    **Shaw Industries Group, Inc. ("Shaw")** is a foreign corporation organized under the laws of Georgia and is authorized to transact business in the State of South Carolina. Shaw operates a manufacturing location in South Carolina. Shaw has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Shaw continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

50.    **Solvay Specialty Polymers USA, LLC ("Solvay")** is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of South Carolina. Solvay operates multiple locations in South Carolina. Solvay has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Solvay continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320017

51.     **Saint-Gobain Abrasives, Inc. ("Saint-Gobain")** is a foreign corporation organized under the laws of Massachusetts and is authorized to transact business in the State of South Carolina.  Saint-Gobain has at least one location in South Carolina.  Saint-Gobain has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Saint-Gobain continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

52.     **T & S Brass and Bronze Works, Inc. ("T & S")** is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of South Carolina. T&S has its principal place of business and headquarters in South Carolina.  T&S has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, T&S continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

53.     **Teijin Carbon America, Inc. ("Teijin")** is a foreign corporation organized under the laws of Delaware and is authorized to transact business in South Carolina.  Teijin owns and operates a manufacturing facility located at 1122 Highway 246 in Greenwood, South Carolina on the banks of Lake Greenwood.  Teijin has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Teijin continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

54.     **Unichem Specialty Chemicals, Inc. ("Unichem")** is a foreign limited liability company organized under the laws of Delaware and is authorized to transact business in the State of South Carolina.  Unichem operates a location in South Carolina.  Unichem has discharged and

17

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Unichem continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

55.     **Unifirst Corporation ("Unifirst")** is a foreign corporation organized under the laws of Massachusetts and is authorized to transact business in the State of South Carolina. Unifirst operates multiple locations in South Carolina.  Unifirst has discharged and continues to discharge wastewater containing PFAS upstream of where Lexington draws water, and as a result, Unifirst continues to invade, trespass, injure, and create a nuisance by entering Lexington's drinking water and wastewater in Lexington County, South Carolina.

## **DISCLAIMER**

56.     This lawsuit is brought under the laws of the State of South Carolina. Lexington asserts no federal cause of action, invokes no federal statutes, and seeks no relief that is based on any federal statute or laws.

57.     Any federal claims are expressly disclaimed by Lexington.

58.     Lexington makes no claim, and asserts no cause of action, to implicate that the manufacture, sale, or use of AFFF in any way caused or contributed to cause the damages, or the claims, asserted in this lawsuit.  Lexington expressly disclaims any cause of action or damages arising from or associated with AFFF manufacture, sale, use or disposal by the named Defendants, or by any unnamed defendant or entities, including any legal or factual claim based on alleged "Mil Spec AFFF." Lexington expressly disclaims any potential claims arguably arising from any federal enclaves, including any military installations or other locations that may have used AFFF pursuant to military specifications. This case is brought against the Defendants in their capacities as private manufacturers and users of PFAS.

59.    Lexington makes no claim, and asserts no cause of action, against any upstream publicly owned wastewater treatment plants.

## NO CLASS ACTION PARTICIPATION

60.    Several Defendants in this case have been sued in other cases involving allegations of PFAS pollution to public water systems.  In 2023, 3M and DuPont settled nationwide, multi-district, class-action claims related to the contamination of public water supplies with PFAS for approximately $10 billion and $1 billion, respectively.  S*ee In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.) ("*AFFF Litigation*").

61.    Prospective class members in the *AFFF Litigation* had the option of "opting out" of the 3M and DuPont settlements in order to pursue individual lawsuits against 3M and DuPont. Lexington validly and timely exercised its right to "opt out" of the *AFFF Litigation* Class Action Settlements with 3M and DuPont in order to pursue their claims in this lawsuit.  Lexington has received confirmation from the Notice Administrator overseeing these settlements that it's opt outs were in fact "compliant."

62.    Judge Richard Gergel, the United States District Court Judge for the District of South Carolina overseeing the *AFFF Litigation*, ultimately entered orders of final approval on the 3M and DuPont settlements.  At no time has 3M, DuPont, or any other party raised objections to Lexington's decision to opt out from the class settlements.

## JURISDICTION AND VENUE

63.    This lawsuit is brought under the laws of South Carolina.  Lexington asserts no federal causes of action, invokes no federal statutes and seeks no relief that is based on any federal statute or laws. Any federal claims are expressly disclaimed.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

64.     Complete diversity does not exist between Lexington and all Defendants. This case arises out of the manufacture, supply, use and disposal of PFAS in the carpet, textile, chemical, finishing, and other related industries, as well as the improper disposal of leachate and/or wastewater containing PFAS. Lexington makes no claim that the manufacture or use of AFFF in any way caused or contributed to its damages or the claims asserted in this lawsuit, and in fact, expressly disclaims any damages arising from AFFF or MilSpec AFFF.

65.     Venue is proper in this Court pursuant to S.C. Code Sections 15-7-20(1) and 15-7-30(F)(1) as the most substantial part of the alleged act or omission, the contamination of Plaintiff's drinking water and wastewater systems by Defendants' chemicals occurred in Lexington County, South Carolina.

## FACTUAL ALLEGATIONS

**I. Manufacturing Defendants Have Known, and PFAS Users Should Have Known for Decades that PFAS are a threat to Human Health and the Environment.**

66.     PFAS are man-made, synthetic chemicals used to impart oil-, water-, and stain resistance to various products, including carpet, paper, and textiles. The same chemical properties that provide enhanced soil-resistant attributes also make PFAS resistant to degradation, allowing them to persist in the environment.

67.     PFAS are known to the EPA and the Defendants as "forever chemicals" because these man-made chemicals persist in the environment for extremely prolonged periods and do not degrade like other chemicals. PFAS accumulate in the human body through the process of bioaccumulation. In fish and mammals, PFAS accumulate, build, and increase through biomagnification.

68.     PFAS also migrate through surface water and groundwater, allowing PFAS compounds to travel long distances while causing extensive contamination.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

69.    Since PFAS do not degrade naturally and are synthetic "forever chemicals," PFAS released into the environment decades ago will remain present and will continue causing pollution that is a threat to public health, unless removed by very specific, sophisticated filtration methods.

70.    Although there are thousands of chemical substances that fall under the PFAS umbrella, the two most notorious PFAS chemicals are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

71.    PFOS and PFOA are considered "long-chain" PFAS (sometimes referred to as "C-8" chemistries), because they contain eight (8) fluorinated carbon atoms.  Defendants knew that, because of the strong carbon-fluorine bond, PFOS and PFOA do not degrade naturally in the environment.

72.    According to the EPA, 3M was the sole manufacturer of PFOS in the United States and the principal manufacturer of PFOS worldwide.  Upon information and belief, 3M supplied PFOS and/or products containing or degrading into PFOS to the PFAS Users for use in their manufacturing processes.

73.    The PFAS Manufacturers all manufactured PFOA and/or products containing or degrading into PFOA.  Upon information and belief, DuPont, Daikin and 3M supplied PFOA and/or products containing or degrading into PFOA to the PFAS Users for use in their manufacturing processes.

74.    3M and DuPont began studying the toxicity of PFOS and PFOA as early as the 1950s and 1960s.

75.    By the 1970s, 3M and DuPont were aware that their products persisted indefinitely in the environment.  3M also knew at this time that its C-8 products were present in the blood of the general population.

76.    In the 1970s and 1980s, 3M began conducting animal studies to determine the possible carcinogenicity of PFAS chemicals.  One such study, an investigation into the effects of PFOS on rhesus monkeys, had to be aborted prior to the conclusion of the study "[b]ecause of unexpected early mortalities in all monkeys at all levels" of PFOS dosage. In 1978, a 3M interoffice correspondence concluded that "[r]ecent animal studies have shown that FC-95 [PFOS] is more toxic than was previously believed."

77.    By the 1980s and 1990s, 3M and DuPont were fully aware that PFOS and PFOA were toxic and persistent in the environment and that conventional treatment methods were ineffective at removing these pollutants.  Nevertheless, the two companies actively hid their findings from regulators and the general public. In 1988, a 3M internal memo raised concerns that 3M had "perpetuate[d] the myth that these fluorochemical surfactants are biodegradable."

78.    In 1997, 3M prepared a Material Safety Data Sheet ("MSDS") for a product containing PFAS. The MSDS contained the following warning:

CANCER:
    WARNING: Contains a chemical which can cause cancer. (3825-26-1)
    (1983 and 1993 studies conducted jointly by 3M and DuPont).

79.    This warning was removed from subsequent MSDSs.

80.    In the late 1990s, 3M began a comprehensive, multi-city investigation into the extent of its PFAS pollution.

81.    3M also concluded during this investigation that reverse osmosis is the only treatment method capable of removing all PFAS.

82.    In 1999, Richard Purdy, one of 3M's lead scientists on the multi-city study, resigned from his position due to his "profound disappointment in 3M's handling of the

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors." *See* Purdy Letter dated March 28, 1999.

83.     Mr. Purdy's letter, which was also sent to a representative of the EPA, further stated that PFOS "is the most insidious pollutant since PCB" and "more stable than many rocks." *Id.*

84.     Following Mr. Purdy's letter, the EPA began an investigation into PFOS after receiving data that "PFOS was persistent, unexpectedly toxic, and bioaccumulative (PBT)." Federal Register/Vol. 68, 2003.

85.     During its subsequent investigation of 3M, the EPA disclosed that "following negotiations with EPA, 3M . . . announced that it will voluntarily phase out perfluorooctanyl sulfonate ("PFOS") chemistry."  The EPA determined that PFOS was toxic and accumulated to a high degree in humans and animals.  The EPA's preliminary risk assessment found unacceptable margins of exposure for workers and possibly the general population exposed to PFOS.

86.     The EPA concluded that "PFOS represents an unacceptable technology that should be eliminated to protect human health and the environment from potentially severe long-term consequences."  Shortly thereafter, the EPA expanded its investigation to perfluorooctanoic acid ("PFOA"), stating the "EPA was concerned in part because 3M had also found PFOA in human blood during the studies on PFOS."

87.     Despite the fact that 3M announced that it was withdrawing PFOS and PFOA from the market in 2000, DuPont and Daikin continued to manufacture and/or use PFOA with full knowledge that these substances had been withdrawn by 3M due to environmental risks and potential health risks to the public.

88.     Upon information and belief, the PFAS Users continued to purchase, use, and discharge PFOA and products containing or degrading into PFOA despite the fact that 3M had

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

withdrawn from the PFOS and PFOA markets due to potential environmental risks and health risks to the public.

89.     In 2005, DuPont paid $10.25 million—the largest civil administrative penalty ever obtained by the EPA under any federal environmental statute—to settle claims brought by the EPA alleging that DuPont withheld information concerning PFOA in violation of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA").

90.     In 2006, 3M paid $1.5 million to settle claims brought by the EPA alleging that 3M violated the TSCA by failing to disclose information concerning PFOS.

91.     By 2006, the majority of an EPA Science Advisory Board expert committee had recommended that PFOA be considered "likely to be carcinogenic to humans."  Similarly, an independent C-8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure, based on epidemiological and other data in the Mid-Ohio Valley.

92.     All of the Defendants knew or should have known that PFOS and PFOA are persistent and bioaccumulative.  All of the Defendants knew or should have known that conventional wastewater and drinking water treatment systems are incapable of removing PFOS and PFOA from water supplies.  Nevertheless, the Defendants in this case supplied, used, purchased, and/or accepted PFOS and PFOA, and/or products containing or degrading into PFOS and PFOA, without using adequate care to prevent the contamination of Lexington's water supply.

93.     PFOS and PFOA manufactured, used, and discharged by the Defendants are still present at dangerously high levels in Lake Murray, Lexington's drinking water supply.  Many of these Defendants are still discharging wastewater, leachate, stormwater, and other types of wastewater containing PFOS and PFOA, or precursors of PFOS and PFOA, upstream of Lexington's drinking water intake.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

94.     Defendants have operated in the past, and/or are currently operating manufacturing facilities related to PFAS and products that contain or degrade into PFAS.  The PFAS Manufacturers use PFAS as part of their manufacturing processes or otherwise supply PFAS or products that contain or degrade into PFAS to various industries.

95.     PFAS, and products that contain or degrade into PFAS, are manufactured, and sold by the PFAS Manufacturers to the PFAS Users. In many instances, the PFAS Manufacturers controlled the PFAS Users' application and use of PFAS-containing products.  These products are subsequently discharged both directly and indirectly into Lake Murray, as well as other tributaries and watersheds that ultimately discharge into Lake Murray upstream of Lexington's drinking water intake in Lexington County, South Carolina.

96.     Because PFAS continues to invade Lexington's drinking water and wastewater, PFAS Manufacturers and PFAS Users have caused and contributed, and are still causing and contributing to, a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products that contain or degrade into PFAS.

**II.  "Short-Chain" PFAS**

97.     After 3M phased out "long-chain" PFAS, it began selling "short-chain" PFAS compounds (sometimes referred to as "C-6" and "C-4" chemistries), and/or products that contained or degraded into "short-chain" PFAS, to the PFAS Users.  DuPont and Daikin eventually converted to "short-chain" PFAS as well.  The PFAS Manufacturers knew that these "short-chain" products actually contained "long-chain" PFAS as an impurity, or otherwise contained precursor compounds that would degrade into long-chain PFAS.

98. The "short-chain" PFAS compounds sold and/or used by the PFAS Manufacturers included and/or degraded into PFBS, PFBA, PFHxA, PFPeA, Gen-X, and more.

99. Defendants knew or should have known that that these "short-chain" PFAS compounds were just as toxic, persistent, and bioaccumulative as their "long-chain" predecessors. Defendants also knew or should have known that conventional wastewater and drinking water treatment systems are incapable of removing "short-chain" PFAS from water supplies. Nevertheless, Defendants supplied, used, purchased, and/or accepted "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Plaintiffs' water supply.

100. Upon information and belief, Defendants continue to supply, use, purchase, accept, and/or discharge "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Lexington's water supply or wastewater effluent, to this day.

## III. PFAS Regulations

101. In 2009, the U.S. Environmental Protection Agency ("EPA") issued a Provisional Health Advisory for drinking water, which set advisory levels of 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS in drinking water.

102. In May of 2016, EPA published a Lifetime Health Advisory for drinking water, which set the levels at 70 ppt *combined* for PFOA and PFOS. This Health Advisory was based on "studies of the effects of PFOA and PFOS on laboratory animals" and "epidemiological studies to human populations" which "indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g.,

26

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."

103.    In 2022, the EPA updated the 2016 Health Advisory for PFOS and PFOA in drinking water, which dramatically lowered the recommended limits to .02 ppt for PFOS and .004 ppt for PFOA. The EPA also set levels for two "short-chain" PFAS: PFBS and Gen-X.

104.    In March 2023, EPA proposed a National Primary Drinking Water Regulation ("NPDWR") to establish legally enforceable Maximum Contaminant Levels ("MCLs") for six PFAS in drinking water: PFOA, PFOS, PFBS, PFNA, PFHxS, and Gen-X. The EPA finalized the NPDWR in April 2024.

105.    Under the NPDWR, public water systems, including Lexington, will be required to provide drinking water with no more than 4 ppt PFOS and 4 ppt PFOA.

106.    Moreover, the NPDWR will require that public water systems, including Lexington, remove PFBS, PFNA, PFHxS, and Gen-X from their drinking water pursuant to a Hazard Index. Under this Hazard Index, *combined* concentrations of these compounds may additionally constitute a violation even where each individual compound is lower than the MCL.

107.    In announcing the new MCLs, EPA stated that it "expects that over many years the final rule will prevent PFAS exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS attributable illnesses."

108.    Pursuant to the NPDWR, EPA also proposed "health-based" Maximum Contaminant Level Goals ("MCLGs") for PFOS and PFOA at zero ppt.

109.    The EPA explained the decision-making process behind its proposed MCLGs: "Following a systematic review of available human epidemiological and animal toxicity studies,

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."

110.     Finally, on April 19, 2024, the EPA formally designated PFOS and PFOA as Hazardous Substances under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). According to the EPA, the designation of PFOS and PFOA as Hazardous Substances under CERCLA is designed to ensure that those responsible for the contamination pay to clean it up.

## IV.  PFAS Pollution In and Around the Lake Murray Watershed

111.     Lexington relies on water from Lake Murray.

112.     Lake Murray contains elevated levels of PFAS as a result of Defendants' past and present manufacture and/or discharge of PFAS.

113.     Because of their persistence and bioaccumulation, PFAS discharged into Lake Murray and its tributaries decades ago are still present in Lexington's water supply and continue to impact Lexington's ability to provide clean drinking water to its water customers.

114.     These "forever chemicals" will continue to pollute Lexington's water supply for generations to come and will be present in Lexington's drinking water in excess of the applicable federal standards until they are removed through very sophisticated filtration methods.

115.     Defendants knew or should have known that PFAS cannot be removed by conventional wastewater treatment methods, and that the Defendants' wastewater containing PFAS passes directly through upstream wastewater treatment systems and back into Lake Murray and its tributaries, upstream of Lexington's drinking water intake on Lake Murray in Lexington County, South Carolina.

116.    In addition to discharging PFAS into Lake Murray and its tributaries directly and indirectly through industrial wastewater discharges to local wastewater treatment plants, some Defendants have also engaged in the land application of sludge containing PFAS, which has further exacerbated PFAS contamination in Lake Murray basin.

117.    As a result of Defendants' manufacture, use, disposal, and discharge of PFAS and/or products and waste that contain or degrade into PFAS, dangerously elevated levels of PFAS have been detected in Lake Murray and its related tributaries and watersheds.  The levels of PFAS detected far exceed EPA's most recent Health Advisory, Maximum Contaminant Levels, and Maximum Contaminant Level Goals.

118.    South Carolina's Department of Health and Environmental Control ("DHEC") performed extensive sampling as part of its Ambient Surface Water PFAS Study.[5]  This sampling revealed significant PFAS detections downstream of Defendants facilities and upstream of Lexington's drinking water intakes in concentrations that exceed 4 ppt for PFOA and PFOS.

119.    The levels of PFAS in Lexington's finished water detected exceed EPA's most recent Health Advisory and Maximum Contaminant Levels ("MCL") and Maximum Contaminant Level Goals ("MCLG"), requiring sophisticated filtration.

120.    Because West Columbia's water treatment plant Lexington relies on for drinking water, like most conventional water treatment plants in the country, is incapable of removing PFAS, Lexington's raw and finished water both contain levels of "forever chemicals" exceeding that which is allowed by EPA under the 2022 Health Advisory and the new MCLs.

---

[5] DHEC's ambient surface water data is made public at: *PFAS-Bureau of Water*, SC Dept. of Health & Environ. Control, https://perma.cc/8RTX-JNSK (last accessed December 29, 2024).

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

121.    Now, through no fault of its own, Lexington will be responsible for the increased costs of removing PFAS from water sourced from West Columbia wastewater treated by the City of Cayce, in order to meet the standards set by the EPA, comply with South Carolina's Code and State Regulations, including S.C. Code. Ann. Regs. § 61-68 *Water Classifications and Standards* and protect public health.

122.    PFAS can only be filtered through the use of costly and sophisticated treatment technology.

123.    Lexington seeks compensatory damages for its pro rata share of any plant upgrades or increased operating expenses, as well as the filtration equipment, piping, and adequate permanent facilities necessary to operate the filtering systems sufficient to remove PFAS from water relied on by Lexington for its customers, who in turn rely on Lexington to provide clean, safe drinking water.

124.    Lexington also seeks compensatory damages to the fullest extent allowed by South Carolina law for its pro rata share of any plant upgrades or increased operating expenses, as well as the filtration equipment, piping, and adequate permanent facilities necessary to operate state-of-the-art filtering systems sufficient to remove all PFAS from Lexington's wastewater prior to release into Lake Murray.

**FOR A FIRST CAUSE OF ACTION**
**NEGLIGENCE/GROSS NEGLIGENCE**

125.    Lexington incorporates all prior paragraphs by reference as if fully set forth and restated herein.

126.    As manufacturers, users, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, disposers, and/or handlers of PFAS, products containing and/or degrading into PFAS, products manufactured using PFAS, and/or waste containing and/or degrading into

PFAS, Defendants owed a duty to Lexington, in its handling, control, use, and disposal of PFAS so as not to cause harm to Lexington.

127.    Defendants owed a duty to Lexington to exercise reasonable care in their manufacturing procedures and waste-handling and disposal operations to prevent the contamination of toxic PFAS chemicals into Lexington's raw water supply, water treatment plant, wastewater treatment plant, and related property.

128.    Defendants owed a duty to Lexington and other downstream drinking water systems under the Antidegradation Rules codified at S.C. Code Ann. Regs. § 61-68 *Water Classification and Standards*, to avoid causing or contributing to the discharge of toxic industrial waste that is harmful to human health to surface waters used for drinking water.

129.    Defendants assumed a duty of due care when they undertook to use PFAS chemicals as described above because Defendants knew or should have known that the PFAS chemicals could contaminate Lexington's drinking water and its wastewater effluent.

130.    Defendants also voluntarily assumed a duty of reasonable care in their manufacture, sale, purchase, handling, and disposal of PFAS-containing products and/or PFAS-containing waste through their internal corporate policies, permits, and adoption of industry-wide standards.

131.    As described in detail above, Defendants breached their duty to exercise due care and reasonable care owed to Lexington.

132.    Defendants knew or should have known that their PFAS is persistent in the environment and is bioaccumulative. Defendants also knew or should have known that conventional filtration systems are incapable of removing PFAS from environmental media, and that users including Lexington would be incapable of removing PFAS from their water supply and wastewater effluent. The PFAS Manufacturers continuously supplied products containing PFAS

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

to the PFAS Users with knowledge that these chemicals would foreseeably contaminate surface waters and downstream water systems—including Lexington's drinking water and wastewater—in their ordinary and regular use. Defendants' breaches of their duties to Lexington constitute negligent, willful, and/or reckless conduct.

133.    Lexington has a reasonable expectation that Defendants should refrain from or otherwise avoid contaminating Lexington's source water, facilities, and the surrounding environment, as well as comply with EPA standards and South Carolina Codes and Regulations.

134.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and omissions, Lexington has been damaged and has incurred expenses and will continue to incur expenses in the future in order to remove PFAS from both its drinking water as well as its wastewater treatment.

135.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on Lexington.

136.    Defendants' conduct, practices, and inactions evidence their reckless disregard for Lexington's water, property, and property interests.

137.    Defendants' conduct should subject them to liability for punitive damages because Defendants' actions were grossly negligent, wanton, willful and careless regarding the contamination of Lexington's water source and wastewater treatment facilities.

138.    Lexington is informed and believes it entitled to judgment against Defendants, jointly and severally, for compensatory damages as well as punitive damages.

## FOR A SECOND CAUSE OF ACTION
### CONTINUING NUISANCE

139.    Lexington incorporates all prior paragraphs by reference as if fully set forth and restated herein.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

140.     Defendants have created a continuing nuisance by failing to prevent the contamination of Lexington's water supply and wastewater with PFAS.  As a direct result, Lexington's drinking water supply, water treatment plants, wastewater treatment plant, and related property are contaminated with PFAS, thereby proximately causing Lexington interference with its use of the property.

141.     Defendants' manufacture and use of PFAS chemicals for decades constitutes a nuisance that is continuous and ongoing as the PFAS chemicals are continuously contaminating and invading Lexington's water supply, property, and property interests.

142.     Each Defendant independently and collectively controlled the cause of the nuisance plaguing Lexington by causing and contributing to the introduction of harmful pollutants into Lexington's drinking water and wastewater.  In many cases, the PFAS Manufacturers controlled the PFAS Users' application and use of PFAS-containing products.

143.     The contamination of Lexington's water supply, related property, and contractual rights constitutes an unreasonable interference or continuing nuisance, which has caused Lexington damages that are separate and distinct from those faced by the general public.

144.     Lexington has suffered damages as a direct result of Defendants' continuing nuisance including but not limited to: past and future expenses associated with installing, maintaining, and operating drinking water treatment systems and associated facilities and equipment capable of removing PFAS; past and future expenses associated with testing and monitoring raw and finished water for the presence of PFAS; and costs associated with remediating Lexington's existing treatment facilities as necessary to remove PFAS from its water supply and wastewater treatment.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

145.    This nuisance has caused substantial damage and will continue to cause damages until Lexington receives compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from water and wastewater treatment for which Lexington is contractually responsible.

146.    Defendants have acted with conscious indifference to the probable dangerous consequences of their actions and the reasonably foreseeable impact such actions would have.

147.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and omissions, Lexington has been damaged and has incurred expenses and will continue to incur expenses in the future to remove PFAS from its drinking water and wastewater.

148.    Defendants' conduct, practices, and inactions evidence their reckless disregard for Lexington's water, property, and property interests.

149.    Defendants' conduct subjects them to liability for punitive damages because Defendants' actions were grossly negligent, wanton, willful, and careless regarding the contamination of Lexington's drinking water source and wastewater.

150.    Lexington is informed and believes that it is entitled to judgment against Defendants, jointly and severally, for compensatory damages as well as punitive damages pursuant to Defendants' continuing nuisance.

## FOR A THIRD CAUSE OF ACTION
### PUBLIC NUISANCE

151.    Lexington incorporates all prior paragraphs by reference as if fully set forth and restated herein.

152.    Lexington owns and occupies property used to serve its water customers, including contractual water rights, a water distribution system and related facilities, and land for a future

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

water treatment plant on the banks of Lake Murray, as well as offices, associated facilities, and other equipment.

153.    Lexington has a property interest in the water it relies on from Lake Murray to provide drinking water to its customers.

154.    Defendants have created and contributed to a public nuisance by causing or contributing to cause PFAS chemicals to contaminate Lake Murray, which is a public waterway from which Lexington collects its drinking water supply.  Defendants' contamination of these waterways obstructs and impairs the public's rights to collect clean and safe drinking water.

155.    The continuance and ongoing contamination of Lake Murray of Lexington's drinking water source, water treatment distribution facilities, related property, and future drinking water intake site constitutes a public nuisance depriving Lexington of its ability to deliver clean and uncontaminated water and wastewater treatment to its customers.

156.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, Lexington's drinking water.  The contamination caused, contributed to, and/or maintained by Defendants substantially and unreasonably interferes with Lexington's property rights to appropriate, use, and enjoy water from Lake Murray.

157.    Defendants' public nuisance has caused substantial damages and will continue to cause damages until Lexington receives compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from Lexington's drinking water supply.

158.    Damage to Lexington's drinking water facilities as well as Lexington's wastewater treatment facility constitutes special damages.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

159.    Defendants committed each of the above-described acts and omissions willfully and with malice, fraud, wantonness, oppression, or lack of the entire want of care which would raise the presumption of conscious indifference to consequences in order to promote sales of their products and/or services. Lexington therefore demands an award of punitive damages because of the aggravating circumstances alleged herein in order to penalize, punish, and deter Defendants' conduct.

160.    Lexington is informed and believes that it is entitled to a judgment against Defendants, jointly and severally, for compensatory damages as well as punitive damages, and the costs and legal fees associated with this action.

## FOR A FOURTH CAUSE OF ACTION
### TRESPASS

161.    Lexington incorporates all prior paragraphs by reference as if fully set forth and restated herein.

162.    Lexington owns and occupies property used to serve its water customers, including a drinking water distribution system, as well as offices, associated facilities, and equipment.

163.    Lexington owns land, water rights and contractual rights which permit it to use water from Lake Murray to provide drinking water to its customers.  Lexington has a possessory interest in the water it uses from Lake Murray in order to treat and sell to its customers.

164.    Defendants' intentional and voluntary acts in manufacturing, supplying, using, and/or discharging PFAS and/or products and waste containing or degrading into PFAS, with full knowledge that these toxins would contaminate Lexington's drinking water supply, caused an invasion and damage to Lexington's property, as well as Lexington's possessory interest in its property by Defendants' chemicals, which has affected and is affecting Lexington's interest in the exclusive possession of their property.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

165.    Defendants' PFAS chemicals have trespassed into Lexington's drinking water treatment facility.

166.    Lexington has at no time consented to the contamination of its water supply or the invasion of its property and possessory interests by Defendants' PFAS chemicals.

167.    Defendants knew or should have known that their manufacture, use, purchase, sale, supply, disposal, discharge, and/or release of PFAS and PFAS-containing products or waste could contaminate Lexington's water supply and result in an invasion of Lexington's possessory interest in its property.

168.    Defendants acted in a wanton fashion with reckless disregard for Lexington's water, wastewater, rights and property interests.

169.    Defendants' trespass is continuous and ongoing.  The contamination resulting from Defendants' trespass has migrated and spread and will continue to migrate and spread.

170.    Defendants' continuing trespass has impaired Lexington's use of its property and has caused and will cause Lexington to suffer substantial damages.

171.    Defendants knew or should have known the danger to Lexington created by Defendants' conduct, practices, actions, and inactions.

172.    Defendants' conduct, practices, and inactions evidence its reckless disregard for Lexington's property.

173.    Lexington is informed and believes that it is entitled to a judgment against Defendants, jointly and severally, for compensatory damages as well as punitive damages, and the costs and legal fees associated with this action.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

## FOR A FIFTH CAUSE OF ACTION
### FAILURE TO WARN

174.    Lexington incorporates all prior paragraphs by reference as if fully set forth and restated herein.

175.    At various times, all Defendants knew, or reasonably should have known, the danger of supplying and or using a man-made synthetic chemical that was environmentally persistent, bioaccumulative and toxic that was otherwise impervious to all conventional methods of filtration and pollution removal.  Given the extent of the risks associated with PFAS to potentially harm human health and pollute the environment, all Defendants had a duty to warn of the harm that would have occurred by releasing PFAS chemicals into the environment through manufacturing wastewater and/or stormwater.  This duty extended to Plaintiff because it was foreseeable, and in fact known, by Defendants that publicly operated treatment works could not remove the pollutants from wastewater and in turn would be released into the environment.

176.    Defendants breached their duty to warn, and as a direct and proximate result of this breach, Plaintiff has sustained damages.

177.    Defendants for decades sold PFAS chemicals to textile mills and other businesses and/or used PFAS chemicals in South Carolina without adequate warnings of the environmental and human health dangers associated with their products, which includes danger to human health, environmental persistence, bioaccumulation, and high mobility in water bodies.  Defendants knew that PFAS tainted wastewater or sludge could not be properly disposed of without sophisticated pretreatment equipment and when discharged to a public sewer system, a publicly owned water treatment facility, and/or directly into the environment, the result would be pollution of drinking water.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

178.    In fact, Defendants knew that their own manufacturing wastewater containing PFAS, and sludge built up in their treatment facilities, should not be discharged and could not be discharged to conventional water treatment facilities because these dangerous chemicals would be "passed through" to public waterways causing great public harm.

179.    Defendants knew that their PFAS polluted wastewater and PFAS polluted sludge had to be incinerated and not released into the environment in order to avoid the widespread PFAS contamination.  Despite this knowledge, Defendants breached their duty to warn of the dangers associated with PFAS from the anticipated disposal of PFAS wastewater or sludge without adequate warnings of the hazard and instructions as to how the contamination could be avoided through the proper sophisticated filtration, incineration, collection, and transport of the pollutants to a certified treatment facility.

180.    Defendants have also failed to warn about the presence of PFAS in their products and wastewater, representing their products as free of PFAS and or safe for use, when in fact their products did contain PFAS and were not safe for ordinary use.

181.    As a result of the Defendants' negligent failure to warn, the drinking water has been polluted with PFAS.  The harm caused by the Defendants was done maliciously and with knowledge, to a high degree of probability, and with reckless indifference to the consequences of their actions, has harmed Plaintiff.

182.    As a direct and proximate result of the conduct of the Defendants, Plaintiff must build sophisticated drinking water treatment facilities that will cost millions of dollars in order to meet the MCLs promulgated by the United States Environmental Protection Agency.  As a result of the PFAS contamination caused by the Defendants, Plaintiff will incur millions of dollars of compensatory damages, and other damages to be proved at trial including punitive damages.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP3200177

### FOR A SIXTH CAUSE OF ACTION
### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT ("SCUTPA")
### S.C. Code Ann. § 39-5-10 *et seq.*

183.    Lexington incorporates all prior paragraphs by reference as if fully set forth and restated herein.

184.    Despite knowing that their PFAS is persistent in the environment and is bioaccumulative, despite knowing that conventional filtration systems are incapable of removing PFAS from environmental media, and despite knowing that users including Lexington would be incapable of removing PFAS from their water supply and wastewater effluent, Defendants unfairly disposed of these chemicals in surface waters and downstream water systems—including Lexington's drinking water and wastewater—in their ordinary and regular use without informing Lexington of any known or potential hazards.

185.    Defendants' intentional and voluntary acts in manufacturing, supplying, using, and/or discharging PFAS and/or products and waste containing or degrading into PFAS, with full knowledge that these toxins would contaminate Lexington's drinking water supply, constitutes an unfair and deceptive act that offends public policy, is substantially injurious to Lexington and its customers, and would plausibly mislead any reasonable person.

186.    As a direct and proximate result of Defendants' conduct, Lexington must fund its share of upgrades and operating expenses pursuant to the Agreement with West Columbia, in order to meet the MCLs promulgated by the EPA.  As a result of the PFAS contamination caused by Defendants, Lexington will incur millions of dollars of compensatory damages, and other damages to be proved at trial including punitive damages.

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177

187.    Defendants' conduct, actions, and/or omissions, individually and/or as agents one for the other, by and through their agents, servants, and/or employees, as set out in detail above, violate the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-140.

188.    Defendants' conduct, actions, and/or omissions, as set out in detail above, have been and continue to be repeated in South Carolina.

189.    Defendants' conduct, actions, and/or omissions, as set forth above, constitute unfair and/or deceptive trade practices that are capable of repetition, and in fact have been repeated by Defendants on a regular basis.

190.    Defendants' conduct was willful, and Defendants knew or should have known that its conduct violated the South Carolina Unfair Trade Practices Act.

191.    As a result of Defendants' actions, Lexington is entitled to actual damages, treble damages, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Lexington respectfully requests this Court grant the following relief:

a)      Award Lexington damages in an amount to be determined by a jury sufficient to compensate Lexington for past and future damages;

b)      Award treble damages pursuant to the South Carolina Unfair Trade Practices Act;

c)      Award punitive damages;

d)      Award prejudgment interests for any costs or damages incurred by Lexington;

e)      Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

f)      Award such other and further relief as this Court may deem just, proper, and equitable.

Respectfully submitted this 14th day of January 2025.

      *s/Amy L.B. Hill*

      Amy L.B. Hill, SC Bar No.: 68541
      William C. Lewis, SC Bar No.: 101287
      Richardson Thomas, LLC
      1513 Hampton Street
      Columbia, South Carolina 29201
      T: 803-281-8150
      F: 803-632-8263
      amy@richardsonthomas.com
      will@richardsonthomas.com

      and

      Lee T. Patterson
      *(pro hac vice admission pending)*
      Ethan R. Wright
      *(pro hac vice admission pending)*
      Carmen V. Paige
      *(pro hac vice admission pending)*
      Friedman, Dazzio & Zulanas, P.C.
      3800 Corporate Woods Drive
      Birmingham, AL 35242
      T: 205-278-7057
      F: 205-278-7001
      lpatterson@friedman-lawyers.com
      ewright@friedman-lawyers.com
      cpaige@friedman-lawyers.com

      ***Attorneys for Plaintiff***

ELECTRONICALLY FILED - 2025 Jan 14 3:02 PM - LEXINGTON - COMMON PLEAS - CASE#2025CP320177